THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARMANDO AMAYA, Defendant-Appellant.

Second District   No. 2—00—0099

Opinion filed May 10, 2001.

G. Joseph Weller, of State Appellate Defender's·Office, of Elgin, and Lawrence D. Wechter, of Batavia, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel) and Gunta Z. Hadac, of Grayslake, for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, Armando Amaya, appeals his convictions of and sentences for attempted murder, first-degree murder, and aggravated discharge of a firearm after three people were shot, one fatally, at an apartment building in Elgin. We affirm in part and vacate in part.

On April 28, 1998, the defendant was charged in a six-count indictment with two counts of first-degree murder in that the defendant shot Jermaine Lambert with the intention of killing him (720 ILCS 5/9—1(a)(1) (West 1996)) and that the defendant shot Lambert knowing such act created a strong probability of death or great bodily harm (720 ILCS 5/9—1(a)(2) (West 1996)); two counts of attempted murder (720 ILCS 5/8—4(a) (West 1996)) in that the defendant shot and intended to kill Alonzo Matthews and Tara Harris; two counts of aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1996)) in that the defendant committed a battery by means of discharging a firearm and shooting Matthews and Harris; and one count of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 1996)) in that the defendant knowingly discharged a firearm in the direction of a person.

The evidence at trial revealed the following. One of the victims, Alonzo Matthews, testified that he was visiting a friend at an apartment at 309 New York Street in Aurora, Illinois, on October 29, 1997, and, as he listened to some girls argue outside the apartment building, he felt someone creep up behind him. A "Mexican" man, 5 feet 8 inches to 5 feet 9 inches tall, 140 to 145 pounds, was dressed in black with a hood on his head and came from the direction of Lincoln Street. Matthews saw the man for only two seconds before the man shot Matthews in the stomach. The shooter's gun was chrome or black, a revolver or an "automatic," and had a wheel-like chamber. Matthews underwent surgery and remained in the hospital for nine days. Matthews admitted that he was on probation in Wisconsin for a drug crime, but he denied being a gang member and did not know why anyone would want to shoot him. The parties stipulated that at the hospital Matthews told a police officer that he could recognize the shooter. During cross-examination Matthews stated that he did not see the shooter in the courtroom.

The other surviving victim, Tara Harris, testified that on October 29, 1997, she was taking her daughter's diaper to the Dumpster on the side of her apartment at 309 New York Street in Aurora, Illinois,

when she stopped to watch some girls arguing. A "Mexican" or "Spanish" man, 5 feet 5 inches or 5 feet 6 inches tall, in his late teens or early 20s, approached the area from the Lincoln Street end of the building. His hands were in his pockets and he wore a jacket with a hood. The hood covered the man's head but not his face. When Harris turned away, she heard two gunshots but did not see a gun. Harris had been shot in the back but did not realize it until she was back in her apartment. She blacked out and later underwent surgery and stayed in the hospital for nine days. The bullet was still in Harris's back at the time she testified. Harris admitted that at the time of trial she was on probation for a drug crime, but she denied being a gang member and did not know why anyone would want to shoot her.

Shayla Johnson testified that she also was watching the girls argue outside the New York Street apartment building on the night in question when she saw the defendant come from the direction of Lincoln Street. The defendant wore black or navy blue, was 5 feet 4 inches tall, and weighed 130 to 140 pounds. The defendant approached the group of girls, bumped into a woman, pushed her out of the way, walked three or four more steps, and started to shoot. Handling the weapon "wildly," the defendant shot five or six times with what Shayla thought was a revolver. Shayla stated that she got a good look at the shooter and recognized him as a man known as "Scarecrow," whom she had seen five or six times before the shooting. Shayla ran from the shooting and did not speak to the police officers at the scene because she did not want to get involved and did not think anyone had been shot. Earlier that evening, as Shayla walked toward the apartment building to meet some friends, she saw the defendant and two other Hispanic men in a white, four-door Celebrity or Century with a red stripe. Two of the car's occupants hung out of the car windows yelling "King love," "GDK," and "Kings rule."

Shayla stated that, less than two months later, on December 19, 1997, she spoke to the Aurora police about the shooting while she was at the police station regarding an unrelated incident. On February 4, 1998, Shayla identified the defendant as the shooter in a lineup and admitted speaking with her friend, Nicole Pearson, another witness, about the incident. Shayla admitted that she had charges for theft and other offenses pending against her and was presently in custody after being arrested for failing to appear in court.

Nicole Pearson testified that on the evening of October 29, 1997, she argued with some girls on the side of the apartment building in question. When the argument ended, a short, teenage "Mexican" man, dressed in black and wearing a black hat, approached from Lincoln Street, carrying a "big gun." Pearson identified that man as

the defendant. The defendant fired the gun, and the crowd scattered. The defendant had difficulty handling the gun. Pearson stated that the defendant pointed the gun at her but did not fire because she was on the ground. The defendant moved away and continued to shoot, and Pearson stood up and ran away. Pearson stated that she had seen the defendant before near a taco restaurant and knew his name as "Scarecrow." Earlier that evening, she saw the defendant in a white car with two other men but did not hear them say anything.

Pearson explained that at the February 1998 lineup she did not think the defendant was the shooter because he had gained weight since the shooting. Pearson also told the officers that she was hesitant to testify because she was afraid that the defendant would kill her. Later Pearson identified the defendant to the police as being present during the shooting and in the white car that evening, but not as the shooter. Still later, after discussing the matter with the police after the lineup, Pearson identified the defendant as the shooter. Pearson admitted that her friend, Shayla Johnson, told Pearson that she (Shayla) believed that the defendant was the shooter and that Shayla told Pearson that the defendant's nickname was "Scarecrow." But Pearson, who lived with Shayla Johnson at the time of the shooting, denied speaking with Shayla about the incident before speaking with the police. Pearson admitted that she had prior convictions of retail theft, resisting a peace officer, disorderly conduct, and criminal trespass and had cases pending for mob action and battery. Pearson denied being a gang member but admitted that she associated with members of the Gangster Disciple gang, wore Gangster Disciple colors, and knew that she was in Gangster Disciple territory the night of the shooting. Pearson also stated that one of the victims, Lambert, was her friend.

William McCalister testified that he saw a man outside the apartment building just before the shooting who wore dark clothing with a hood. McCalister did not see a gun but heard gunshots a few minutes later. McCalister admitted that he had a theft charge pending at the time of trial.

Tracy Johnson testified that just before the shooting he was drinking alcohol with his friends when he saw three Hispanic men in a white Chevrolet Celebrity drive by the New York Street apartment building two or three times. The men in the Chevy made gang signs that were insulting to Gangster Disciples. Later, Tracy heard three gunshots and then saw the three men that were in the Celebrity run from the area of the shots, cross the street, and get into the same white Celebrity that was parked at the Lincoln Laundry on Lincoln Street. At approximately 10:30 p.m., Tracy saw the men being stopped by the police. Tracy then told the police what he knew and gave a

taped statement at 11:50 p.m. Tracy admitted that, both before and after the incident, he drank a pint of gin and some beer with his friends that evening and that he previously received substance abuse treatment. In addition, Tracy admitted that he had a prior conviction of a felony drug charge and convictions of several residential burglaries, burglary, attempted burglary, and retail theft.

Aurora police officer Scott Wolters testified that he stopped the white Celebrity that evening at approximately 10:30 p.m. The defendant sat in the front passenger seat wearing faded blue jeans and a hooded overcoat with a black hooded sweatshirt. Romero Sandoval was also in the car wearing a dark Nike hooded pullover and a black leather jacket. The third man in the car was George Gamboa. Wolters found no weapons or ammunition either in the vehicle or on any of the men in the car.

Officer Mike Doerzaph testified that Tracy reported that he had seen the three men who had been stopped running from the scene of the shooting.

Aurora police sergeant Mike Langston, an expert in gang activity, testified that the defendant and the two others who were arrested were members of the Latin Kings gang and that the defendant's nickname was "Scarecrow." The Latin Kings were rivals of the Gangster Disciples; however, none of the victims, nor Shayla Johnson or Nicole Pearson, was a member of any gang. The shooting occurred in Gangster Disciple gang territory. The Lincoln Laundry, the place where the white Celebrity was parked during the shooting, was located on the edge of Gangster Disciple territory. The phrase "King love" showed respect for the Latin Kings, and "GDK" stood for "Gangster Disciple Killer." Langston added that gang members commonly used getaway drivers and lookouts when entering rival gang territory, since it was risky to enter that territory on foot.

Aurora police officer James Fancsali testified that, when Tracy Johnson gave his statement to the police the evening of the shooting, he did not appear to be intoxicated and had no odor of alcoholic beverages. In February 1998, Shayla Johnson identified the defendant in a lineup as the shooter, after first stating that the defendant was not the shooter and then stating that he was present at the shooting but was not the shooter.

Aurora police officer Jeffrey Sauer corroborated Fancsali's testimony regarding Pearson's lineup statements. Pearson told the officers that the shooter was "skinnier" and lighter than the defendant.

Aurora police officer Andrew Hilgenberg testified that, while on patrol on October 29, 1997, he was dispatched to the apartment building at 309 East New York Street to secure the inside of a crime scene

at 309 East New York Street. When Officer Hilgenberg arrived at approximately 8:45 p.m., Matthews, who appeared to have been shot, was in front of the apartment building. The parking lot area was illuminated. Hilgenberg then entered Tara Harris's apartment and spoke with her. Harris also had been shot. Jermaine Lambert was lying on his back in Harris's kitchen in a pool of blood. Lambert appeared to be breathing but was pronounced dead at 9:03 p.m. by a paramedic.

Evidence technician Stan Kahle testified that he found clothing in the white Chevy Celebrity but did not collect the clothing for evidence and did not find any weapons or ammunition.

The parties stipulated that a forensic pathologist would testify that Lambert's autopsy would reveal that Lambert received a single, penetrating gunshot wound to the chest that was consistent with the barrel of the weapon being placed directly on the body. The gunshot wound caused Lambert's death, the bullet having penetrated through the heart and right lung.

Over defense counsel's objection, the trial court included instructions on the principles of accountability. After deliberations, the jury found the defendant guilty of first-degree murder (bodily harm) of Lambert, attempted murder of Harris and Matthews, aggravated battery with a firearm as to both Harris and Matthews, and aggravated discharge of a firearm. The trial court denied the defendant's posttrial motion. Regarding sentencing, the State conceded and the trial court agreed that the aggravated battery convictions merged with the attempted murder convictions. The State urged the trial court to impose consecutive sentences based on section 5—8—4(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5—8—4(a) (West 1996)), seeking a finding that the defendant committed a Class X felony and inflicted severe bodily injury. Defense counsel objected to the imposition of consecutive sentences, arguing that the State failed to present evidence at sentencing regarding the issue of severe bodily injury.

The trial court sentenced the defendant to 40 years' imprisonment for the first-degree murder conviction, 10 and 12 years' imprisonment for the convictions of the attempted murder of Harris and Lambert, respectively, and 9 years' imprisonment for the aggravated discharge of a firearm conviction. The court ordered the sentences for the murder and attempted murder convictions to run consecutively for a total of 62 years' imprisonment and the sentence for aggravated discharge of a firearm to run concurrently with the other sentences. The court based its decision to impose consecutive sentences on its findings that the defendant had committed a Class X felony, that the offenses were part of a single course of conduct with no substantial change in the

nature of the criminal objective, and that defendant inflicted severe bodily injury in the murder and attempted murder offenses. The trial court subsequently denied the defendant's motion to reconsider the sentences, and the defendant filed this timely appeal.

On appeal, the defendant first argues that he is entitled to a new trial because the trial court erroneously instructed the jury regarding the accountability theory. In the alternative, defendant asserts that there was insufficient evidence to support a guilty verdict on a theory of accountability because the evidence supported a guilty verdict based only on the defendant's acting as a principal. The State responds that there was sufficient evidence to warrant the accountability instructions, there was sufficient evidence to support a guilty verdict on the theory of accountability, and that, even if the instruction was erroneous, it was harmless error because there was overwhelming evidence that the defendant was guilty as a principal.

■ It is well settled that a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis. *People v. Dennis*, 181 Ill. 2d 87, 95 (1998). That is, improper jury instructions will not warrant a new trial unless the result of the trial would have been different had the jury been instructed properly. *People v. Pena*, 317 Ill. App. 3d 312, 319 (2000). For example, when a jury is improperly instructed regarding the principles of accountability, a new trial is not warranted if the evidence is sufficient to find the defendant guilty beyond a reasonable doubt as a principal. *Pena*, 317 Ill. App. 3d at 319.

■ In this case, there was ample evidence to support a guilty verdict based on the defendant's acting as a principal. There was uncontroverted evidence that, just prior to the shooting, the defendant was riding in a car with two other men, yelling insults and making insulting gestures at a rival gang, and that the defendant and his cohorts were members of the Latin Kings, rivals of the Gangster Disciples. Four witnesses, including both surviving victims, testified that a Hispanic or Mexican male who wore dark clothes approached the crowd outside the apartment building from Lincoln Street and shot at the crowd. Two women, Shayla Johnson and Nicole Pearson, who were present at the scene of the shooting, identified the defendant as the man who approached and fired a gun into the crowd. It was uncontroverted that three people were shot, one fatally, and that the shooting occurred in territory "belonging" to the defendant's rivals, the Gangster Disciples. Another witness, Tracy Johnson, testified that after he heard shots he saw three Hispanic men run from the scene of the shooting back to a white Chevy Celebrity that was parked just outside Gangster Disciple territory. Considering this evidence, we

determine that there was ample evidence to find the defendant guilty beyond a reasonable doubt as a principal. Therefore, even if there was not enough evidence to warrant instructing the jury on the principles of accountability, the error was harmless and a new trial is not required. See *People v. Rhodes*, 243 Ill. App. 3d 701, 706 (1993).

■ Next, the defendant contends that his conviction of aggravated discharge of a firearm was carved out of the same physical acts as the convictions of first-degree murder and attempted murder. Thus, the defendant argues that his conviction of aggravated discharge of a firearm must be vacated under the one-act, one-crime doctrine. See *People v. King*, 66 Ill. 2d 551, 559-66 (1977).

After considering a similar argument in *People v. Crespo*, 203 Ill. 2d 335 (2001), our supreme court recently held that the defendant's conduct of stabbing a victim three times constituted only one single act and did not support multiple convictions. The court stated that, although the conduct could have supported two separate convictions, one of aggravated battery and another of armed violence, the State did not differentiate between the stab wounds and did not apportion them to separate offenses either in the charging instrument or to the jury at trial. *Crespo*, 203 Ill. 2d at 342-43. Therefore, the State was precluded from treating the defendant's conduct as multiple acts supporting multiple convictions. *Crespo*, 203 Ill. 2d at 345.

*Crespo* controls the issue presented to us here. In this case, the charging instrument indicates that the State intended to treat the conduct of the defendant as a conglomerate of three gunshots. The indictment did not differentiate between the three gunshots that actually struck the victims and other shots that were fired by the defendant without striking anyone. Rather, the aggravated discharge of a firearm count charged the defendant with the same conduct as the other counts but under a different theory of culpability without distinguishing between the three shots that struck the victims and any other shots the defendant may have fired.

Further, at trial the prosecutor presented the case as involving a conglomerate of three shots. Although at least one witness testified that he heard four or five shots, the prosecutor, during closing arguments, spoke only of the three shots that struck the victims. He did not discuss the other shots that could have supported a separate conviction of aggravated discharge of a firearm. The prosecutor never argued that some of the gunshots would be sufficient to sustain a conviction of aggravated discharge of a firearm and that other, separate shots would be sufficient to sustain a conviction of first-degree murder and attempted murder. Since the State failed to apportion the gunshots among the two charges, it cannot do so now on appeal. *Crespo*, 203 Ill.

2d at 345. Further, because aggravated discharge of a firearm is a less serious offense than first-degree murder and attempted murder, the defendant's conviction of aggravated discharge of a firearm must be vacated. See *People v. Milton*, 309 Ill. App. 3d 863, 868 (1999).

■ Lastly, the defendant argues that the imposition of consecutive sentences violated his rights under the due process clause of the United States Constitution (U.S. Const., amend. XIV) as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). This issue was not raised in the trial court below; however, we will review it as plain error because it affects a fundamental right. See *People v. Keene*, 296 Ill. App. 3d 183, 186 (1998).

In *Apprendi*, the United States Supreme Court found unconstitutional a New Jersey "hate crime" statute allowing the imposition of an extended-term sentence if the trial court found by a preponderance of the evidence that, when committing the offense at issue, the defendant acted with a racially biased purpose. The Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

In sentencing the defendant in this case, the trial judge found that the defendant had been convicted of a Class X felony, no substantial change occurred in the nature of the criminal objective, and the defendant had inflicted severe bodily injury. The trial court ordered the defendant's sentences to be served consecutively under section 5—8—4(a) of the Code (730 ILCS 5/5—8—4(a) (West 1996)). Relying on *Apprendi*, the defendant argues that section 5—8—4(a) is unconstitutional because it allows a trial court to make factual findings—in this case, a finding that the defendant inflicted severe bodily injury—that increase the permissible range of penalties by requiring the defendant's sentences to run consecutively. The State argues that *Apprendi* does not apply to section 5—8—4(a) of the Code because that section does not authorize the imposition of a sentence that is beyond the prescribed statutory maximum for any particular offense. Rather, the State asserts, an order that multiple sentences run consecutively pursuant to section 5—8—4(a) affects only the manner in which the sentences will be served, not the length of those sentences.

Section 5—8—4(a) provides, in relevant part, as follows:
> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the crimi-

nal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, \*\*\* in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5—8—4(a) (West 1996).

We agree with the State that *Apprendi* was not violated here. The imposition of consecutive sentences does not increase the penalty for a crime beyond the prescribed statutory maximum. Rather, it only determines the manner in which the sentence for each individual offense is to be served. *People v. Primm*, 319 Ill. App. 3d 411 (2000). Our supreme court has characterized consecutive sentences as " 'sentences following in a train, succeeding one another in a regular order, with an uninterrupted course or succession, and having no interval or break.' [Citation.]" (Emphasis omitted.) *Thomas v. Greer*, 143 Ill. 2d 271, 278 (1991). In other words, connecting the several individual freight cars of a train together does not increase the size of each individual freight car. Thus, for purposes of an *Apprendi* analysis, the penalty for a crime is not increased when sentences are ordered to be served consecutively under section 5—8—4(a) of the Code based on severe bodily injury. *People v. Sutherland*, 317 Ill. App. 3d 1117, 1131 (2000).

We understand that the Appellate Court, First District, has held otherwise in *People v. Clifton*, 321 Ill. App. 3d 707, 726 (2000), and *People v. Carney*, 317 Ill. App. 3d 806 (2000). However, we respectfully disagree with these decisions. These courts based their decisions on the statement made in *Apprendi* that "the relevant inquiry is not one of form" (*Apprendi*, 530 U.S. at 494, 147 L. Ed. 2d at 457, 120 S. Ct. at 2365) but of the effect of the required finding and that, since a finding of severe bodily injury increased the sentence for a single course of conduct, that finding had to be made by a fact finder and not the court. *Carney*, 317 Ill. App. 3d at 812-13; *Clifton*, 321 Ill. App. 3d at 726.

This reasoning expands the holding of *Apprendi* beyond its scope. The statutory scheme invalidated in *Apprendi* permitted a sentence to be *extended past the maximum permitted by statute* upon a finding by the trial court that the defendant acted with a racially biased purpose. In this case, the defendant's sentence was not extended but was ordered to be served consecutively, and the defendant's *mens rea* was not at issue. Rather, the imposition of consecutive sentences was imposed after a finding that the defendant inflicted severe bodily injury. Thus, we decline to follow *Carney* and *Clifton* by expanding the holding of *Apprendi* here.

Further, even if an *Apprendi* violation occurred here, the error is harmless beyond a reasonable doubt. The facts were uncontroverted that in the two attempted murder offenses the defendant shot one

victim in the stomach and another in the back. Both victims required surgery and a lengthy hospital stay and the bullet remained in one victim at the time of trial. Therefore, no reasonable juror, having already found the defendant guilty of the offenses charged, could have found that the defendant did not inflict severe bodily injury and, thus, the outcome would not have been different if a jury had decided this issue. See *People v. Johnson*, 149 Ill. 2d 118, 159 (1992) (supreme court determined that a gunshot wound to the shoulder constituted severe bodily injury); *Primm*, 319 Ill. App. 3d at 427 (appellate court held that gunshot to the thigh constituted severe bodily injury). Thus, we will not vacate the imposition of consecutive sentences.

The judgment of the circuit court of Kane County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

GEIGER and GROMETER, JJ., concur.