**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 140288-UB

Order filed October 21, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0288 Circuit No. 11-CF-625 |
| DUSHAWN JOHNSON, | ) ) ) | Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justices Holdridge and Wright concurred in the judgment.

**ORDER**

¶ 1　　*Held*: Defendant's conviction for aggravated discharge of a firearm violated the one-act, one-crime rule. Defendant's aggregate sentence of 76 years' imprisonment constituted an unconstitutional *de facto* life sentence in violation of *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny.

¶ 2　　Defendant, Dushawn Johnson, was convicted of first degree murder, attempted first degree murder, aggravated discharge of a firearm, and aggravated unlawful use of a weapon. He was 17 years old at the time of the offenses. On appeal, defendant initially argued that his sentence was excessive and his conviction for aggravated discharge of a firearm violated one-act, one-crime

principles. We affirmed defendant's sentence and vacated his conviction for aggravated discharge of a firearm. *People v. Johnson*, 2016 IL App (3d) 140288-U, ¶ 46. Our supreme court directed us to vacate our prior judgment and "consider the effect of this Court's opinion in *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and determine if a different result is warranted." *People v. Johnson*, No. 121608 (Ill. Mar. 25, 2020) (supervisory order). The parties have filed supplemental briefing addressing this issue. After reconsidering the matter, we vacate in part and remand with directions.

¶ 3                                   I. BACKGROUND

¶ 4        Defendant was charged by indictment with: (1) two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)) for shooting Maria O'Connor; (2) one count of attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1)) for firing a handgun at Javon Saulsberry; (3) one count of attempted first degree murder (*id.*) for firing a handgun at Jessie Dorsett; (4) one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)) for "knowingly discharg[ing] a firearm in the direction of another" within 1000 feet of King Middle School; and (5) one count of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A)).

¶ 5        Two trials were held. After the first trial, the jury found defendant guilty of aggravated unlawful use of a weapon but was unable to reach a verdict on the other charges. Defendant was retried on the remaining charges.

¶ 6        After the second trial, defendant was found guilty of one count of first degree murder and two counts of attempted first degree murder for firing a handgun multiple times from a moving vehicle on a street where Ashley Rutledge, Christina Magee, Jasmine Magee, Maria O'Connor, Javon Saulsberry, and Jesse Dorsett were walking. O'Connor was hit by a bullet and died as a

2

result of her injuries. Rutledge, Christina, Jasmine, and O'Connor had been walking together. Saulsberry and Dorsett had been walking together, near to but separate from the four women. Police officers recovered seven spent shell casings from the scene of the shooting. Defendant was also found guilty of aggravated discharge of a firearm within 1000 feet of a school.

¶ 7 During closing argument, the prosecutor noted that O'Connor, Rutledge, Jasmine, and Christina were on the street when the shooting occurred, in addition to Dorsett and Saulsberry. Regarding the charge of aggravated discharge of a firearm within 1000 feet of a school, the prosecutor stated: "Again pretty self-explanatory, ladies and gentlemen. I'm not gonna go into that much detail about that."

¶ 8 Defendant filed a motion for a new trial. At the hearing on defendant's motion, the trial court asked the prosecutor if the State had a position regarding whether the aggravated discharge of a firearm count merged with the other offenses of which defendant was found guilty. The prosecutor replied:

> "I believe it does not because in addition to the—I mean Ms. O'Connor when she was walking down [the] street, she was with a group of other people and the firearm obviously was discharged in their direction because she was struck, but I think the aggravated discharge can apply to the other three individuals that she was walking with as well as Saulisberry [*sic*] and Dorsett."

¶ 9 A presentence investigation report (PSI) was filed. The PSI indicated that defendant declined to make a statement regarding his involvement in the present offense. Defendant had a prior juvenile conviction of aggravated battery to a school employee. Defendant reported that he was primarily raised by his mother but stayed with his father in Minneapolis for one to two months at a time throughout his childhood. Defendant also stayed with his great aunt in Minneapolis when

3

he was in fifth and sixth grade and attended school in Minneapolis during that time. Defendant lived with his mother until he was 15 years old. Defendant's mother became homeless and he lived with a friend for a while before moving to his own place. Defendant stated that he did not have a relationship with his father but saw him "every couple years." Defendant also stated that he stayed with his father in Minnesota "for a couple of months" before he was arrested in connection with the instant case. Defendant was married and had a child.

¶ 10        Defendant reported that he first drank alcohol and smoked marijuana in 2009. Defendant stated that he did not often drink alcohol. Defendant smoked one ounce of marijuana per day until the day of his arrest. Defendant had previously been diagnosed with major depression. Defendant reported being sad while in jail but having no mental health issues. Defendant denied being affiliated with any gang but acknowledged that he spent a lot of time with members of the Harrison Gents and the Vice Lords. Defendant reported engaging in drug transactions with the gang members.

¶ 11        At defendant's sentencing hearing, Barbara Bowman testified that she was appointed as a mitigation expert in the instant case and had prepared a report. Bowman had an undergraduate degree in psychology and a master's degree in criminal justice. She had never been qualified as an expert in the fields of psychology or psychiatry.

¶ 12        In preparing her report, Bowman spoke with defendant, defendant's mother, and defendant's grandmother. Defendant's grandmother told Bowman that defendant had had psychological problems since childhood. Defendant's grandmother stated that when defendant was approximately five years old, he had visual and auditory hallucinations of a little boy who told defendant to hang himself. Defendant's grandmother told Bowman that on one occasion,

4

defendant wrapped a venetian blind around his neck and jumped off a bed. Defendant was taken to the hospital for a psychiatric evaluation at that time.

¶ 13    Bowman examined defendant's school records, which showed that defendant had significant learning problems and received special education services. Defendant's intellectual cognitive functioning was found to be borderline to low average. Defendant's full scale intelligence quotient (IQ) was 78. An evaluation in defendant's education records stated that defendant had been in at least 11 schools, had been homeless, had moved several times, and had lived with various family members. The evaluation indicated that defendant saw things and heard sounds that were not there, threatened to hurt others, bullied others, ate things that were not food, drank alcoholic beverages, hit other adolescents, and was easily annoyed by others. He scored in the 99th percentile on the clinical maladjustment composite.

¶ 14    When Bowman interviewed defendant, he told her that he began drinking alcohol when he was 15 years old and began smoking marijuana when he was 11 years old. Defendant reported that he smoked marijuana seven times per day at the time of his arrest. Defendant told Bowman that drinking alcohol and smoking marijuana slowed his brain down, and he felt agitated and irritable when he was sober.

¶ 15    Defendant's grandmother indicated to Bowman that defendant was easily manipulated and had a strong desire to be liked by others. She said that defendant "would do anything anybody asked him in order for a little bit of love and affection."

¶ 16    Defendant told Bowman that he was involved with a gang, and the gang asked him to do various things in exchange for marijuana. Defendant told Bowman that he was ordered by his codefendant to fire the gun. Defendant said that he did not want to fire the gun and deliberately

misaimed to avoid hitting who he was supposed to shoot. Defendant said he did not want to kill anyone. Bowman stated:

> "[Defendant] was 17 years old at the time when an adolescent's brain is—is—their logical thinking functioning is not very high, even in the most sophisticated of adolescents, and given his significantly low IQ, his—his neglect, the fact that he was high on alcohol and marijuana at the time of the offense, he was afraid of his co-defendant—absolutely, I think he was influenced."

¶ 17  Defendant gave a statement in allocution in which he said: "I am sad for the victim who lost her life and for the family who lost their loved one. I pray that they will find peace from this terrible tragedy."

¶ 18  During arguments, the State challenged Bowman's qualifications and the accuracy of parts of her report and testimony. The State argued that a minimum sentence was not warranted due to the gravity of the offense.

¶ 19  Defense counsel argued that the mandatory minimum was "far more than is appropriate in this case." Counsel argued that the applicable sentencing scheme violated the eighth amendment because the court was "not allowed to exercise any discretion in essence." Defense counsel contended that the court did not have sufficient discretion to consider the mitigating background information it had presented, including defendant's young age, due to the minimum sentence required by the law. Defense counsel asserted that the minimum possible sentence under the applicable statutes would exceed defendant's life expectancy.

¶ 20  After hearing arguments, the court noted that defendant was 17 years old at the time of the offense. The court found that "much of the information set forth in the [PSI] corroborates the findings set forth in the mitigation report." The court then discussed defendant's family

background, his history of homelessness, his difficulty in school, and his history of psychological problems. The court then stated:

> "There's no question that [defendant] did not have a traditional nurturing childhood. *** The—I think the—the defense point certainly is that how can *** this information really benefit a court in pronouncing a sentence when the minimum sentence takes you out to the age of 84? Because the minimum number of years you will have to serve is 67 years ***. So there's not a lot of room for the application of discretion in—in sentencing you. And so the defense argument is that essentially this is a mandatory life sentence given that 84 is statistically probably beyond your statistical life span. You're very very likely to die in prison and that is with the minimum mandatory sentence being applied, but that is the state of the law in Illinois. It—whether or not the sentencing scheme unduly prevents the Court taking into consideration these—these factors such as your age and the disruptive childhood in which you were plagued with some degree of mental illness, you know, which you did not have a father figure in your life, you may well have been bullied, you were abusing drugs, that would be—that has to be a matter for a higher court *** to decide because the state of the law is now that the Court cannot—cannot go lower than—the sentence of *** 71 years."

¶ 21    Regarding defendant's statement to Bowman that he did not intend to kill anyone, the trial court stated: "[W]hat kind of credit can I give to that statement? That's an unsworn statement. It's not subject to cross-examination." Addressing defendant, the trial court stated:

> "[W]hat's without dispute is that you took your arm out of that vehicle and you fired multiple rounds, broad daylight, many people in the area, and a young girl lost

her life *** because she just happened to be standing there that day. It goes without saying that *** that type of behavior is *** totally unacceptable and has the effect of disrupting and damaging *** an entire community. That you took a life, you threatened other lives, and it is necessary that you be sentenced appropriately. Okay. And—and Illinois law requires that—that I sentence you *** appropriately within the range of potential sentences for each of these offenses."

¶ 22    The court sentenced defendant to 25 years' imprisonment for the first degree murder of O'Connor, plus a mandatory add-on of 25 years' imprisonment because defendant used a firearm in the commission of the offense. The court imposed sentences of 6 years' imprisonment plus mandatory 20-year add-ons for the attempted first degree murders of Saulsberry and Dorsett. The trial court ordered that the attempted first degree murder sentences run concurrently with one another but noted that they were required by statute to run consecutively with the 50-year first degree murder sentence. The court also sentenced defendant to eight years' imprisonment for aggravated discharge of a firearm and three years' imprisonment for aggravated unlawful use of a weapon, both to run concurrently with defendant's attempted first degree murder sentences.

¶ 23                                      II. ANALYSIS

¶ 24                                   A. One-Act, One-Crime

¶ 25    We first address defendant's argument that his conviction for aggravated discharge of a firearm must be vacated under one-act, one-crime principles. Specifically, defendant argues that his aggravated discharge of a firearm conviction was based on the same physical act as his first degree murder and attempted murder convictions. We agree.

¶ 26    Defendant acknowledges that he forfeited this issue but asks that we review it under the second prong of the plain error doctrine. "The plain-error rule bypasses normal forfeiture

8

principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The second prong of the plain error doctrine is applicable where " ' "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." ' " *People v. Clark*, 2016 IL 118845, ¶ 42 (quoting *Thompson*, 238 Ill. 2d at 613, quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Our supreme court has held that "it is well established that a one-act, one-crime violation affects the integrity of the judicial process, thus satisfying the second prong of the plain-error test." *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009); *Clark*, 2016 IL 118845, ¶ 46 (recognizing that *Samantha V.*, 234 Ill. 2d 359, has not been overruled). Thus, the only question before us is whether a one-act, one-crime violation actually occurred.

¶ 27        Under the one-act, one-crime rule, a defendant may not be convicted of multiple offenses based on the same physical act. *People v. Almond*, 2015 IL 113817, ¶ 47. In this context, "act" means "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977).

¶ 28        For multiple convictions to be sustained for separate but closely related acts, the indictment must indicate that the State intends to treat the conduct of the defendant as multiple acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001). In *Crespo*, the trial evidence showed that the defendant stabbed one victim three times in rapid succession. *Id.* at 338. The defendant was convicted of one count of armed violence and two counts of aggravated battery based on his conduct of stabbing the same victim. *Id.* at 337. The *Crespo* court held that the three separate stab wounds to the same victim could not sustain multiple convictions because the three stab wounds were not apportioned among the three offenses in the indictment. *Id.* at 343. The court also noted that the State's theory

at trial, as evidenced by its closing argument, was that defendant's conduct constituted a single attack. *Id.* at 344.

¶ 29 Similarly, in *People v. Green*, 339 Ill. App. 3d 443 (2003), the defendant was convicted of two counts of attempted first degree murder and one count of aggravated discharge of a firearm based on evidence that the defendant reached his arm out of the window of a moving car and fired a pistol four to five times in the direction of four plainclothes police officers sitting in two unmarked cars. *Id.* at 446-47. On appeal, the court reversed defendant's conviction for aggravated discharge of a firearm on one-act, one-crime principles because the State did not apportion the defendant's separate but closely related acts of firing a pistol four to five times in the charging instrument. *Id.* at 459. Rather, the charging instrument merely stated that defendant " 'discharged a firearm.' " *Id.*

¶ 30 Additionally, in *People v. Amaya*, 321 Ill. App. 3d 923 (2001), the defendant was convicted of attempted murder, first degree murder, and aggravated discharge of a firearm based on evidence that the defendant fired gunshots at several people standing outside an apartment building, hitting three people. *Id.* at 924-25. At least one witness testified that he heard four to five gunshots. *Id.* at 930. The court vacated the defendant's conviction of aggravated discharge of a firearm, finding that the indictment failed to differentiate between the three gunshots that actually struck the victims and other shots fired by defendant. *Id.* The *Amaya* court also noted that the prosecutor only discussed the three gunshots that struck the victims during closing argument and did not argue that some of the gunshots would be sufficient to sustain an aggravated discharge of a firearm conviction when separate shots would be sufficient to sustain murder and attempted murder convictions. *Id.*

¶ 31 Here, like in *Amaya* and *Green*, the trial evidence showed that defendant fired a series of several gunshots in the direction of multiple people. As in *Amaya*, *Green*, and *Crespo*, the

indictment failed to apportion the various gunshots among the various charges. The prosecutor did not argue that some of the gunshots would be sufficient to sustain a conviction for aggravated battery while other gunshots would be sufficient to sustain convictions for first degree murder and attempted first degree murder. While the prosecutor noted that Rutledge, Christina, and Jasmine were also in the area where the gunshots were fired, the prosecutor did not argue that the aggravated discharge of a firearm charge was based on shots fired in their direction. The most the prosecutor said during closing arguments about the charge of aggravated discharge of a firearm within 1000 feet of a school was that it was "pretty self-explanatory."

¶ 32    Thus, we hold that defendant's conviction for aggravated discharge of a firearm within 1000 feet of a school was improper under one-act, one-crime principles because it was based on the same physical act as defendant's first degree murder and attempted first degree murder convictions. See *Crespo*, 203 Ill. 2d at 343; *Green*, 339 Ill. App. 3d at 459; *Amaya*, 321 Ill. App. 3d at 930. As violations of the one-act, one-crime rule constitute second-prong plain error (*Samantha V.*, 234 Ill. 2d at 378-79), we vacate defendant's conviction of aggravated discharge of a firearm within 1000 feet of a school.

¶ 33    In reaching our holding, we reject the State's reliance upon the prosecutor's statement that he did not believe the aggravated discharge of a firearm charge merged with the first degree murder charge because "the aggravated discharge [could] apply to the other three individuals that [O'Connor] was walking with as well as Saulisberry [*sic*] and Dorsett." This statement was made after the jury found defendant guilty, and the State did not articulate this theory of the case at trial.

¶ 34                    B. Constitutionality of Sentence

¶ 35    We next address defendant's argument that his aggregate sentence of 76 years' imprisonment was an unconstitutional *de facto* life sentence because he was a juvenile at the time

11

of the offense, the circuit court failed to consider his youth and its attendant characteristics, and the circuit court failed to find that defendant was among the rare offenders whose permanent incorrigibility warranted a *de facto* life sentence.

¶ 36    The State argues that this issue is forfeited based on defendant's failure to raise this in his initial brief. However, in its supervisory order, the supreme court directed us to address this issue. *Johnson*, No. 121608. Accordingly, we reject the State's forfeiture argument and proceed to address the issue.

¶ 37    In our recent decision in *People v. Johnson*, 2020 IL App (3d) 130543-B, ¶¶ 28-31, we set forth a detailed discussion of the case law from the United States Supreme Court and Illinois Supreme Court that applies to this issue. We will briefly summarize that case law in the instant case.

¶ 38    In *Miller*, 567 U.S. at 479, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." The *Miller* Court held that, before imposing sentences of life imprisonment without the possibility of parole, sentencing courts were required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 39    Since *Miller* was decided, the Illinois Supreme Court has expanded its reach in several respects. In *Buffer*, 2019 IL 122327, ¶ 27 our supreme court summarized the current state of *Miller* jurisprudence in Illinois as follows:

> "[T]o prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the

12

sentencing court failed to consider youth and its attendant characteristics in imposing the sentence."

See also *People v. Holman*, 2017 IL 120655, ¶ 40; *People v. Reyes*, 2016 IL 119271, ¶ 9. The *Buffer* court held that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Buffer*, 2019 IL 122327, ¶ 41.

¶ 40    The "attendant characteristics" of youth that the sentencing court is required to consider include, but are not limited to:

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

Moreover, "a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.*

¶ 41    Here, the court made no finding that defendant was irretrievably depraved, permanently incorrigible, irreparably corrupted, or otherwise beyond the possibility of rehabilitation. The court noted that the law as it stood at the time of sentencing gave it no discretion to impose any sentence other than one that would likely amount to life imprisonment. While the court considered the

13

defendant's age, evidence of his difficult family background, and history of mental illness, it was unable to impose anything other than a *de facto* life sentence under the applicable sentencing statutes. See 730 ILCS 5/5-4.5-20(a), 5-4.5-25(a), 5-8-1(a)(1)(d)(iii), 5-8-4(d)(1) (West 2010). Accordingly, the court was not able to give meaningful consideration to defendant's youth and its attendant characteristics.

¶ 42 The appropriate remedy is to vacate defendant's sentence and remand the matter for resentencing under section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)). See *Buffer*, 2019 IL 122327, ¶ 27; *Holman*, 2017 IL 120655, ¶ 45; *Reyes*, 2016 IL 119271, ¶ 12. This will afford the court the discretion not to apply the firearm enhancements and to impose a sentence that does not amount to a *de facto* life sentence.

¶ 43 As we have vacated defendant's sentence, we need not consider defendant's excessive sentence argument, which he raised in his initial brief.

¶ 44                                    III. CONCLUSION

¶ 45 For the foregoing reasons, we vacate defendant's conviction for aggravated discharge of a firearm under one-act, one-crime principles. We also vacate defendant's aggregate sentence of 76 years' imprisonment. We remand the matter for a new sentencing hearing in compliance with section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2016)).

¶ 46 Vacated in part and remanded with directions.