NOTICE
Decision filed 12/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230021-U

NO. 5-23-0021

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-2396 |
| | ) | |
| MANTIA JOHNSON JR., | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices McHaney and Vaughan concurred in the judgment.

**ORDER**

¶ 1　*Held*: (1) The evidence at trial was sufficient to sustain the defendant's convictions for first degree murder and attempted murder; (2) the defendant failed to establish his claim of ineffective assistance of counsel; and (3) defendant's conviction for aggravated discharge of a firearm violates the one-act, one-crime rule and is vacated.

¶ 2　Following a jury trial, the defendant, Mantia Johnson Jr., was convicted of one count of first degree murder, one count of attempted first degree murder, and one count of aggravated discharge of a firearm. As to the murder and attempted murder counts, the jury found that the firearm enhancements—that the defendant personally discharged a firearm during the commission of the offenses—were not proven. The trial court sentenced the defendant to consecutive terms of 30 years' imprisonment for first degree murder, 15 years' imprisonment for attempted murder, and 10 years' imprisonment for aggravated discharge of a firearm. This direct appeal follows.

1

¶ 3    On appeal, the defendant raises three main issues. First, he challenges the sufficiency of the evidence to convict him at trial. Second, he alleges his trial counsel was ineffective for failing to renew a motion *in limine* to introduce evidence providing an alternative explanation for telephone calls placed to and from the defendant's phone. Lastly, the defendant argues that his conviction for aggravated discharge of a firearm should be vacated under the one-act, one-crime doctrine.

¶ 4                                              I. BACKGROUND

¶ 5    On August 6, 2021, the defendant was charged, by information, with two counts of first degree murder, one count of attempted first degree murder, one count of aggravated discharge of a firearm, and one count of unlawful possession of weapons by a felon. Thereafter, on September 16, 2021, a grand jury returned a true bill of indictment against the defendant.

¶ 6    The indictment consisted of six counts. Count I charged the defendant with first degree murder and alleged that on August 2, 2021, the defendant, without lawful justification, and by means of personally discharging a firearm with the intent to kill Ahmaad Nunley, shot Ahmaad Nunley multiple times, thereby causing his death. Count II charged the defendant with first degree murder and alleged that on August 2, 2021, the defendant, without lawful justification, and by means of personally discharging a firearm, shot Ahmaad Nunley multiple times, knowing such act created a strong probability of death or great bodily harm to Ahmaad Nunley, and thereby causing his death. Count III charged the defendant with attempted first degree murder and alleged that on August 2, 2021, the defendant, without justification and with the intent to commit the offense of first degree murder, knowingly and by means of personally discharging a firearm and with the intent to kill Shamyia Seay, shot Shamyia Seay multiple times. Count IV charged the defendant with aggravated battery with a firearm and alleged that on August 2, 2021, the defendant

2

knowingly and by means of the discharging of a firearm caused an injury to Shamyia Seay in that the defendant shot Shamyia Seay multiple times. Count V charged the defendant with aggravated discharge of a firearm and alleged that on August 2, 2021, the defendant knowingly discharged a firearm in the direction of another person or in the direction of a vehicle he knew or reasonably should have known to be occupied by a person. Count VI charged the defendant with unlawful possession of weapons by a felon and alleged that on August 2, 2021, the defendant, a person who had been convicted of the felony offense of domestic battery, knowingly possessed on his person a 9-millimeter handgun. The defendant demanded a speedy trial, and the matter proceeded with discovery.

¶ 7     Relevant to this appeal is the pretrial motion *in limine* to allow evidence of drug use and sales at a mobile home located in the Sunny Shores Trailer Park ("trailer park") with the address 3120 West Chain of Rocks Road, Lot 165, Granite City, that was filed on behalf of the defendant on August 17, 2022. The motion *in limine* asserted, *inter alia*, that the evidence of drug use and sales should be admitted "to rebut the State's evidence that various calls made throughout the evening were expressly for the purpose of the planning and commission of first degree murder, and rather shows there was excessive drug use and sales taking place that reasonably could have been the purpose of the phone calls." A hearing on the motion *in limine* was conducted on August 18, 2022, and ruled on the same day. The trial court ordered (1) that Nunley's toxicology report attached to the autopsy report may not be disclosed to the jury, (2) the fact that witnesses or victims were using controlled substances may be relevant and is therefore a permissible area of direct or cross, (3) no discussion of a drug overdose or the use of Narcan as it relates to Nunley is permitted, and (4) a neighbor's observations and belief that one of the witnesses is a drug dealer is speculation and not relevant and may not be disclosed to the jury.

¶ 8    The defendant's case proceeded to a jury trial, which commenced on August 22, 2022. The State only proceeded to trial on the counts alleging first degree murder, attempted first degree murder, and aggravated discharge of a firearm. The following pertinent facts were gathered from the evidence produced at trial.

¶ 9    The first witness called by the State was Sergeant Adam Conner of the Granite City Police Department. Conner testified that he had been a police officer for 12 years, and in August of 2021, he was working as a midnight patrol sergeant for the Granite City Police Department. On August 2, 2021, at approximately 1:30 a.m., Conner was dispatched to the area of Illinois Route 3 at Rock Road for a shooting. Upon his arrival at the scene, he observed a white Chevrolet Impala facing the wrong direction in the northbound lanes of Route 3 near Bissell Street. He noticed that both driver's side tires were flat, there were gray scrapes on the driver's side, and paint transfer on the passenger side.

¶ 10    Conner testified that he made contact with Shamyia Seay, who was outside of the vehicle on the passenger side near the shoulder. He observed that Seay had apparent gunshot wounds to her right arm and back area, and she was alert and conscious. Seay was transported to St. Louis University Hospital.

¶ 11    Conner observed that Ahmaad Nunley was in the front passenger seat area of the Impala. Nunley was face down, almost in a kneeling position, with his face in the seat and his legs almost kneeling down on the passenger side floorboard, with his back towards the dashboard. Nunley was nonresponsive and had labored breathing. Nunley was transported by helicopter to St. Louis University Hospital.

¶ 12    Conner identified several photographs that were taken at the scene. He identified People's Exhibits 54 through 66 as photographs of the Impala that were taken when Conner responded to

4

the crime scene. He testified the photographs fairly and accurately depicted the vehicle at the crime scene. Exhibits 54 through 66 were admitted into evidence without objection. The photographs depicted bullet holes in the vehicle and spent projectiles in the vehicle.

¶ 13 Conner testified that after Seay and Nunley were tended to, he preserved the scene until detective and crime scene investigators arrived. He was not responsible for any further investigation of the case.

¶ 14 Shamyia Seay was the next witness to testify on behalf of the State. Seay testified that she had known Nunley for three years, and he had been her boyfriend during that time. The two lived in Nebraska. Seay testified that on August 1, 2021, she and Nunley were in the Granite City area because her mother had died. At approximately 5 p.m. to 6 p.m., Seay and Nunley arrived at Seay's grandmother's house in Cahokia, Illinois. They stayed there until approximately 11 p.m. or 12 a.m. When they left, they traveled to the trailer park in Granite City. They traveled to see one of Nunley's friends whom Seay knew only as Nick.

¶ 15 Seay believed they arrived at Nick's trailer at approximately 12 a.m. on August 2, 2021. Upon arriving, Nunley told her to sit outside while he went into the house. Seay testified she stayed outside in the car for approximately 35 minutes before she left to travel to a gas station on Salisbury in St. Louis, Missouri, to buy pills. The parties stipulated to the admission of video footage, which was played for the jury and depicted Seay driving a white Chevrolet Malibu onto the Phillips 66 gas station parking lot. Seay testified that she was at the gas station for less than five minutes.

¶ 16 After leaving the gas station, she drove back to the trailer park. Video footage of Seay returning to the trailer part at 12:52 a.m. was played for the jury after another stipulation by the parties. She testified that she waited in the car for approximately 15 to 30 minutes before Nunley exited the trailer. One of Nunley's friends, who went by Dino, exited the trailer and spoke to Seay

5

while she waited outside. She testified that Dino was a nickname for Deangelo. Seay testified when Nunley exited the trailer, he was upset, and he did not want to drive. Nunley got into the front passenger side and laid the seat back. They left the trailer park and headed towards Cahokia.

¶ 17   Seay stated she made a left turn onto Route 3 just past Wal-Mart in Granite City. As she was driving in a southbound direction, the car she was driving was shot. She testified that she did not initially see where the shots came from but then noticed a dark colored Durango pulling away. Seay identified People's Exhibit 39S as a photograph that fairly and accurately depicted the vehicle from which the shots came from. She identified distinct taillights that went across the entire back of the vehicle.

¶ 18   Seay testified she was driving in the left lane when a vehicle pulled up next to her car in the right lane and started shooting. She tried to duck and lost control of the vehicle. She then called 911. Seay was shot in her right arm and in her back. While on the phone with 911, she exited the car and went to the passenger side where Nunley was located. She tried to help but was unable to due to her injuries. She testified that Nunley was unresponsive. She said his eyes were open and he was still alive, but unable to speak.

¶ 19   She testified that police responded immediately and tended to her and Nunley. She was placed in an ambulance and was told that Nunley would be airlifted to St. Louis University Hospital (SLU).

¶ 20   Seay was transported by ambulance to SLU, and she was hospitalized for five days. She identified People's Exhibit 68 as a photograph that fairly and accurately depicted the injuries to the left side of her back. She testified that she was shot four times, and she underwent surgery for the injuries to her right arm.

6

¶ 21    Seay testified that she did not see who was in the vehicle that shot at her vehicle, nor did she see who fired the gun. She also did not know how many people were in the vehicle.

¶ 22    Grant Hentze, a crime scene investigator (CSI) for the Illinois State Police, testified regarding his investigation of the scene. He responded to assist another crime scene investigator due to the size of the crime scene. Hentze responded to the northern area of the crime scene. Hentze recovered seven fired cartridge cases as part of his investigation. He also photographed the scene, took measurements, and created a diagram of the scene. The photographs and diagram were admitted into evidence without objection.

¶ 23    Jason Perkins, a CSI for the Illinois State Police, testified regarding his investigation. Perkins also photographed and measured the crime scene. Perkins examined the southern portion of the crime scene near the Impala. Perkins used an unmanned aircraft system, commonly known as a drone, to take aerial photographs of the scene. Perkins collected 4 fired projectiles and 13 fired cartridge cases from the scene.

¶ 24    Once the fragile evidence had been removed from the Impala, the vehicle was transported to a garage for further processing by Perkins. Perkins also attended Nunley's autopsy, which was conducted by the St. Louis City Medical Examiner's Office on August 3, 2021. Perkins assisted by taking photographs during the autopsy and collecting evidence. Perkins collected six fired projectiles that the pathologist removed from Nunley's body.

¶ 25    As part of the investigation, Perkins also processed a blue Mazda. The registration indicated that the blue Mazda was owned by Marcisha Bush. Inside the Mazda was a program from Jermaine Lovett's funeral. Receipts bearing the name Larry Lovett (Larry) were also located in the Mazda.

7

¶ 26    On cross-examination, Perkins testified that he did not test any of the evidence in the case for gunshot residue. He also testified that he processed a black Chevrolet Malibu that contained items bearing the name Mantia Johnson on them. Perkins confirmed he did not process a Dodge Durango.

¶ 27    Thomas Gamboe, a retired forensic scientist for the Illinois State Police, testified regarding his involvement with the investigation. As a forensic scientist, Gamboe specialized in firearm, tool mark, footwear, and tire track identification. Gamboe was recognized as an expert in firearm and tool mark identification without objection. For the present case, Gamboe examined several different sets of shell casings and projectiles.

¶ 28    Gamboe testified that he examined the seven shell casings that were collected by CSI Hentze and determined they were all fired by the same firearm. Gamboe examined the 13 shell casings that were collected by CSI Perkins and determined that seven of them had been fired by a single firearm and that a different firearm had fired six. Gamboe testified that these three groups of shell casings had been fired from three separate firearms. He had no knowledge to show a connection between the shell casings collected from the northern crime scene by Hentze and those collected from the southern crime scene by Perkins.

¶ 29    Gamboe also examined the projectiles that were recovered during the investigation. He determined that there were 11 fired bullets or fragments of bullets that were fired by the same firearm. Four fragments were unsuitable for testing. Based upon the evidence, Gamboe concluded that only one firearm was used to fire projectiles at the Impala.

¶ 30    Gamboe also testified regarding gunshot residue. He explained that the preferred timeframe to swab for gunshot residue is less than two hours. At intervals longer than two hours, gunshot residue is more easily knocked or wiped off.

8

¶ 31    Clyde Leonard testified on behalf of the State. Leonard testified he was a lifelong resident of Texas. He was previously married to Larry Lovett's sister, Danesha Hammons. Leonard and Hammons lived together in Texas from 2004 to 2008 and share two children together.

¶ 32    Leonard testified that in December 2007 he and Hammons traveled to Illinois to visit family. It was during this visit that Leonard first met Larry. After attending a basketball game with Larry, Larry's cousin, Jay, and another man, who was later identified as Mantia Johnson, the men were in a car that ended up "being shot up." Leonard testified that he did not recall meeting the defendant 14 years ago.

¶ 33    In 2008, Hammons returned to Madison, Illinois, and the children moved with her. Leonard remained in Texas. He testified he would travel to Illinois to visit his children and did so until 2012.

¶ 34    Leonard resumed trips to Illinois to visit his children in 2020, after he was informed his ex-wife was struggling financially and with some mental health issues. He testified that he and his ex-wife did not get along. Initially, Leonard sent money electronically through Cash App to Larry to provide financial assistance for the children. Leonard had not spoken to Larry since 2007 until 2020, when making arrangements for financial help for Leonard's children. Eventually, Larry assisted Leonard in visiting his children. Leonard would fly to St. Louis, Missouri, once a month to visit his children over the weekend. During this time, Leonard would also spend time with Larry and Larry's friends and family, including his cousin Jermaine Lovett (Jermaine).

¶ 35    Leonard testified regarding his last visit to St. Louis, which began on July 30, 2021. Leonard testified that he flew from Houston to St. Louis, and Larry picked him up at the airport. The night he flew in, Larry and Leonard stayed at Larry's aunt's, Linda Lovett, home. The second

night he was in the area, Leonard stayed at an apartment in Fairview Heights, Illinois, because Larry's friend had given him a key to an apartment that had an extra room.

¶ 36     On August 1, 2021, Leonard and Larry went to a bowling alley in Fairview Heights at approximately 10 p.m. Leonard testified that he rode to the bowling alley with Larry in a blue Mazda. They stayed at the bowling alley for two hours. Surveillance footage from the bowling alley was played. Leonard identified himself on the footage, and he was wearing a light green shirt. Leonard also identified Larry in the footage, who was wearing a dark shirt. Leonard testified that he and Larry finished their game of bowling with two women, and then Larry received a phone call. After the call, Larry indicated he needed to leave. Leonard and Larry left in the blue Mazda. Leonard testified that as they were leaving in the Mazda, Larry received another call. Larry then drove to the East St. Louis area and drove to a dark alley or garage where a truck was parked. At that point, they exited the blue Mazda and got into the Durango. The Durango belonged to Larry's cousin, Jermaine. Larry then drove the Durango while Leonard was in the front passenger seat.

¶ 37     Leonard testified that they left East St. Louis, crossed a bridge, passed the Casino Queen, and crossed another bridge back into Illinois. Once the men were back in Illinois, they traveled to an apartment complex. Larry exited the vehicle and went inside an apartment for approximately five minutes. Larry and another man left the apartment. Larry returned to the driver's seat, and the other man entered the passenger side rear door. Once everyone was in the vehicle, Larry made introductions by saying, "Clyde, this is Boo. Boo, this is Clyde." Leonard identified the defendant in the courtroom as the man he was introduced to as Boo.

¶ 38     The men then left in the Durango. Larry stopped at a Waffle House because the Durango was "fishtailing like the tires was low." While at the Waffle House, the defendant was the only

10

one to exit the vehicle to go inside to get change. Larry then drove the Durango across the street to a gas station, Step-N-Go, to inflate the tires.

¶ 39    Leonard testified that Larry and the defendant exited the Durango to put change in the machine and air in the tires. Leonard testified that while air was being put in the tires, he was sitting in the front passenger seat. Before leaving the gas station, Leonard stated he moved to the back seat because Larry asked him to. After leaving the gas station, Larry drove to a trailer park community, made a U-turn, and parked across the street from the trailer park. The men sat parked there for approximately 15 to 20 minutes. During this time, Leonard testified that he was looking at Instagram on his phone while seated in the back seat, and Larry and the defendant were talking. Leonard testified that he noticed the defendant pull out a flip phone and show it to Larry.

¶ 40    Larry then drove the vehicle back the same way they arrived to the trailer park, passing the Waffle House they had stopped at earlier. Leonard testified that while they were driving down Route 3, Larry opened the sunroof. Leonard thought this was odd because they were driving fast, between 90-100 miles per hour, and the air conditioning was on. Leonard testified that he looked back at his phone, and when he looked up again, he saw the defendant going out the sunroof. Leonard described the defendant as having his knee on the middle console, and his torso was out of the sunroof, facing towards the driver's seat. As Leonard saw the defendant out of the sunroof, he heard the first gunshot. Leonard testified that when he heard the first gunshot, he fell to the floorboard between the seats. Leonard stated that he heard 10 to 13 gunshots at the same time and saw the defendant holding a gun. Leonard did not see who or what was being shot at.

¶ 41    After the shooting stopped, Leonard stayed on the floor for two to three minutes until Larry asked if he was okay. Leonard testified that Larry and the defendant were laughing after the shooting. Larry drove the Durango back to the location where the blue Mazda was parked. The

11

men exited the Durango and got in the Mazda. Larry drove the Mazda to the Phillip 66 gas station, with Leonard in the front passenger seat, and the defendant in the back seat. Leonard testified that the defendant exited the Mazda and entered the gas station to purchase a drink. After leaving the gas station, the men returned to the apartment in Fairview Heights, where they spent the night. Leonard testified that upon returning to the apartment, he looked for a return flight home. While at the apartment, he observed the gun near the defendant and his belongings.

¶ 42    The following morning, Larry, Leonard, and the defendant went to Lowe's, so Larry could purchase materials for a house he was working on in Granite City. After leaving Lowe's, the men drove in the Mazda to the house in Granite City. Upon their arrival at the Granite City house, a blue Chrysler was parked there with a man whom Leonard did not know, called Cuzo. Larry and the defendant exited the Mazda and got inside the Chrysler to talk to Cuzo for approximately 5-10 minutes. Larry and the defendant then returned to the blue Mazda and drove back to Fairview Heights.

¶ 43    On August 4, 2021, Leonard needed to use a car, so he obtained permission to drive the blue Mazda. Leonard went to a restaurant to eat, returned to the apartment to put his food in the fridge, and then left the apartment to go to the mall. Before arriving at the mall, Leonard was stopped by police and taken for questioning. Leonard told police that he arrived in town after the murder happened. Leonard also told several other lies to police about who he had been with, when he left the bowling alley, and where his cell phone was located. Leonard had two cell phones on his person that were taken by police.

¶ 44    Leonard testified that he had met Larry's cousin Jermaine and hung out with him a handful of times. Leonard stated he was not close to Jermaine and would not have killed someone for him. Leonard testified that he did not know Nunley or Seay.

12

¶ 45    Originally, Leonard was charged with murder and obstructing justice. Leonard accepted a plea deal to testify truthfully in exchange for a sentence of one year in the Illinois Department of Corrections (IDOC) for obstructing justice; the murder charge was dismissed.

¶ 46    On cross-examination, Leonard was questioned regarding the multiple statements he gave to police. On August 4, 2021, Leonard was stopped while driving the Mazda, was arrested, and held in custody. On that day he gave a statement. On August 6, 2021, Leonard was charged with obstructing justice, and a bond hearing was held. Bond was posted for Leonard, and he was allowed to return to Texas. Leonard gave a statement on August 6, 2021. Leonard was later arrested for first degree murder and transferred back to Illinois, which led to him giving two statements on September 13, 2021. Leonard gave another statement on December 14, 2021. Leonard testified that he lied to police when giving his initial statements because he was afraid for his life. Defense counsel highlighted Leonard's lies during cross-examination.

¶ 47    Leonard testified that he told the truth to Detective Donahey on September 13, 2021, when he gave his second statement that day. Leonard acknowledged that Donahey told him that he didn't think Leonard was the shooter and could not have known what was going to happen since he lived out of state. Donahey also told Leonard he would reach out to the State's Attorney's office on his behalf.

¶ 48    Leonard testified that he told Donahey that he was angry with Larry after the shooting, and an argument ensued. Leonard was upset that he was not dropped off before the shooting took place because he did not want to be involved in any activities of that nature. On redirect examination, Leonard stated his testimony at trial had been truthful.

¶ 49    The next witness to testify for the State was Dr. Tatiana Bihun. Dr. Bihun testified that she was employed as a medical examiner at the St. Louis City Medical Examiner's office. Dr. Bihun

13

was recognized as an expert in forensic pathology. Dr. Bihun performed an autopsy on Nunley and prepared a report of her findings. Dr. Bihun concluded that Nunley's cause of death was a gunshot wound to the head.

¶ 50    Richard Walker testified for the State next. Walker had known Nunley for about 15 years. Walker knew Nunley from being in the same neighborhood in Madison, Illinois. Walker considered Nunley to be a friend. Walker also knew the defendant for about 15 years. He knew the defendant by the nickname "BG Boo." Walker had a contact saved in his phone as BG Boo with the telephone number 618-631-0421. Walker last spoke to the defendant approximately one to two weeks before Nunley's death.

¶ 51    Walker also knew Deangelo Enlow and had his phone number. Walker knew Enlow and the defendant to be cousins. He had Enlow's phone number saved in his phone under the nickname Dean. Walker testified that in late July 2021 and early August 2021 he saw the defendant and Enlow when they stopped by his house. The men were living out of state at the time but were in town for a few weeks to visit their children.

¶ 52    Benjamin Martin, a detective with the Madison County Sheriff's Department, also testified for the State. As part of the investigation of Nunley's death, Martin was asked to canvas an apartment complex to locate potential witnesses. Video footage showed the suspect vehicle pulling into an area known as the Port Authority Depo; Martin went to the apartments in this area to look for witnesses.

¶ 53    During the investigation, on August 5, 2021, Martin made contact with Maggie Clayborn, who resided in one of the Port Authority apartments. Clayborn was the long-time girlfriend of Mantia Johnson, Sr., the defendant's father. Clayborn gave Martin permission to enter the apartment and to look in a living room closet. Located inside the closet were several duffle bags,

14

a white grocery bag, and a pair of orange sandals that had the word "Diadora" on them. The sandals were the same sandals that were visible in a photograph that had been distributed as the possible suspect. The bags identified as belonging to the defendant were seized as potential evidence.

¶ 54 Next, Maggie Clayborn testified. Clayborn testified that the defendant sometimes stayed at her apartment and had some belongings there. The defendant was at the apartment on August 2, 2021, at approximately 5 p.m. The defendant went upstairs, used the restroom, went into his bag in the closet, and then left. Clayborn gave police permission to enter her apartment, and they took the bags from the closet belonging to the defendant. Clayborn did not recall her prior statement to police regarding the vehicle that the defendant had arrived in.

¶ 55 Detective Martin was then recalled as a witness and testified regarding his interview with Clayborn on August 5, 2021. His interview with Clayborn was recorded, and a clip of the recording was played wherein she identified a silver Durango as the vehicle that dropped off the defendant on Monday afternoon.

¶ 56 Brandi Williams testified for the State. Williams testified that she is the daughter of Clayborn, and that the defendant is her step-brother. Williams stated she was at her mother's apartment almost daily as her mother watched her children. She recalled seeing a dark-colored truck running a few spaces down from her mother's apartment when she arrived to pick up her children. She testified that she was aware of who the defendant would hang out with and that he and Jermaine Lovett were friends.

¶ 57 Next, Brandon Shellenberg, a detective with the Granite City Police Department, testified for the State regarding his involvement with the investigation. He testified that he was assigned as an investigator, along with other officers in the detective division, in response to this incident. Shellenberg and other members of the investigative team collected and reviewed surveillance

15

videos from several locations. He testified that he retrieved recordings from the Phillips 66 gas station at 11th and Salisbury in St. Louis, cameras along the Route 3 corridor in Granite City and Venice, as well as cameras maintained by the Port Authority Depo. He described the layout and direction of the cameras and explained that through these recordings, investigators were able to track the movements of Nunley's white Malibu, the Durango, and a blue Mazda 6 that became a vehicle of interest. These videos were published to the jury, including screenshots taken from the Phillips 66 video of the defendant purchasing a drink. Additionally, he testified that he conducted surveillance at 59 Northbrook Circle, Apartment 12, Fairview Heights, Illinois, where law enforcement located the blue Mazda. There, he observed a woman, later identified as Robin Ashford, entering and exiting the apartment. At one point, Ashford left carrying a bag, which officers seized. The bag contained several items linking the investigation to Larry Lovett: a wallet in his name, photographs, a cell phone, and an iPad tablet. A search warrant was executed at the apartment. During the search, investigators discovered additional items, including a Dodge SRT key fob and a document bearing Lovett's name. These items, combined with the bag's contents, were collected as evidence and inventoried according to standard procedure. Shellenberg testified that the iPad was turned over to a qualified digital evidence examiner for a forensic download. The parties entered into a stipulation regarding the recovery, chain of custody, and data extraction process for the iPad. Shellenberg identified and authenticated People's Exhibits 46B, 46C, and 46D as screenshots taken from the software program that extracted data from the iPad. Exhibit 46B depicted the interface of the software program that allows access to the different applications of the iPad, such as call logs, text messaging, photos, and social media apps. It also depicted manufacturing information and identification for the device. Exhibit 46C was a photograph of Larry Lovett's Illinois driver's license. Exhibit 46D was a photograph of Larry Lovett.

16

¶ 58    Cody Beishir, a detective with the Granite City Police Department, testified for the State. He testified that he obtained and reviewed surveillance videos primarily from businesses along West Chain of Rocks Road between the trailer park and Route 3. He identified, and the parties stipulated to several surveillance videos, including but not limited to, videos from the Sun Motel, the Route 66 Kickstand, Step-N-Go, the Econo Lodge, the Waffle House, and the Sunny Shore Trailer Park. These videos were published to the jury and tracked the movements of the Impala and Durango in that area as it related to the shooting. Beishir testified that additional surveillance videos were obtained from businesses along Route 3. He identified and the parties stipulated to additional surveillance videos, including, but not limited to, videos from Weber Chevrolet Dealership, North St. Louis Lumber, Port Authority, Beelman Trucking, and BP Amoco. Several of these videos were published to the jury and tracked the movements of the vehicles in the area along Route 3. Lastly, Beishir testified that he was not aware of any camera or surveillance video that captured the exact location on Route 3 where the shooting took place.

¶ 59    Next, Ronald Barrios, a detective with the Granite City Police Department, testified for the State. As part of the investigation, he testified that a search warrant was obtained for the bags and items seized from Clayborn's apartment. Barrios identified the orange sandals seized from the apartment. Additionally, he identified shorts that had a design of several donuts on them, socks that had a similar donut design, and a white t-shirt as items that were located and seized pursuant to the search warrant conducted on the bags. The clothing items matched the defendant's clothing worn on the night of the shooting.

¶ 60    Nicolis Samuels testified next for the State. He testified he lived at 3120 West Chain of Rocks Road, Granite City, Illinois, Lot 165. He testified that he grew up with the victim, Nunley, and the defendant and was good friends with both. Samuels testified that during the late evening

17

hours of August 1, 2021, he was at home with his family, and the defendant and Dino[1] were also present. The defendant and Dino had been at his house since the previous day. He testified that Nunley called him at approximately 11:35 p.m. and told him he was coming over. After the phone call, Samuels told everyone in the home that Nunley was coming. He testified that the defendant left his home shortly after he had announced Nunley was coming over. Nunley arrived around midnight, approximately 15 minutes after the phone call. When Nunley arrived, Samuels, his family, and Dino were the only individuals present in the home. He testified the adults were hanging out and "getting high." Samuels testified that Nunley stayed for approximately 30 minutes. He did not know how Nunley arrived or how he left the home. After Nunley left, Samuels testified he and Dino left to get cigarettes at approximately 1 a.m. He testified he noticed police activity near the Newport or West Madison area once they came across McKinley Bridge. He found out about Nunley's death the next morning through a phone call from a friend. He testified he knew the defendant by the nickname "Boo." The defendant never returned to Samuels' home that evening.

¶ 61     On cross-examination, Samuels denied that his memory of the events were inaccurate due to drug use. He testified that he and the other adults in the home were doing drugs, including marijuana and heroin. He testified that he had three prior felony convictions. In 2016, he was convicted of possessing cocaine with the intent to deliver and possession of a weapon by a felon and sentenced to four years in prison. In 2014, he was convicted of fleeing the police and was sentenced to jail time and probation. In 2012, he was convicted of possession of a controlled substance. He denied that it was common for people to come to his home to use drugs during this time period. Samuels testified that he was interviewed three separate times by the police. He

---

[1]As referenced above in Seay's testimony, Dino is a nickname for Deangelo Enlow.

testified that he did not mention the defendant's name to the police until the third interview, because he was not asked who was at his house the evening before until then. He denied being high during the interviews and denied that his drug use affected his ability to remember.

¶ 62    Robbin Ashford testified that she resided in Granite City, Illinois, and in late July 2021 met an individual she knew only as "L," through the internet. She described their relationship as casual and stated they had only seen each other a few times. Although she did not know where he lived, she acknowledged visiting an apartment in Fairview Heights associated with him on one or two occasions. Ashford identified photographs of that apartment and confirmed she had been inside it. She testified that on August 4, 2021, she went to the apartment to retrieve car keys she believed she had left there. According to Ashford, "L" asked her to collect certain items from the apartment, which included a laptop, a wallet, and a picture. She placed those items into a bag and left the apartment. As she left, Ashford was approached by several detectives and arrested. The officers seized the bag containing the items. Ashford identified the bag and the photograph during her testimony, noting that the only person in the photo she recognized was "L." She stated that she did not know anything about the death of Nunley apart from what she had seen on the internet and that she had no personal knowledge of the incident. On cross-examination, she testified that no one else was in the apartment.

¶ 63    Antoinette Compton testified next for the State. Antionette Compton testified that she lived in Granite City, Illinois, and was the mother of four children: Jonte, Ahmaad, Arianne, and Andre. She confirmed that her son, Ahmaad Nunley, was deceased. Compton identified a photograph of Nunley, which was admitted into evidence without objection. She stated that Nunley was 30 years old at the time of his death and was the father of two sons, Ahmaad and Amere. Compton last saw Nunley at her home on Sunday, August 1, 2021. She recounted that in the early morning hours of

19

the following day, she received a call from St. Louis University Hospital, informing her that she needed to come to the hospital quickly. She went there and was present with her son when he passed away.

¶ 64    Jeffrey Donahey, a sergeant with the Granite City Police Department, testified for the State. He testified he had been a police officer for 27 years and was serving in the investigative division in August of 2021, primarily handling violent crimes. He described his specialized training in digital forensics and cellphone analysis, including work with the Major Case Squad of Greater St. Louis and the U.S. Secret Service Cyber Crimes Unit. Donahey's curriculum vitae was admitted, and he was accepted as an expert in historical cell record analysis without objection. He testified that he assisted in the investigation by analyzing phone and device records obtained through search warrants from Verizon, Sprint, T-Mobile, and AT&T. The records corresponded to devices associated with the defendant (a cellphone), Larry Lovett (a cellphone and iPad), and Clyde Leonard (a cellphone), and were admitted into evidence. He explained how each carrier provided location and usage information in different forms—Verizon through Real Tool Time (RTT) estimates, Sprint through data session tower connections, T-Mobile by reporting tower connections for calls, and AT&T through Network Location Operating System (NELOS) GPS-based data with accuracy ranges. He testified that the call data records (CDR) track the phone or device and not the individual personally. This is done through a unique serial number assigned to the phone or device called an International Mobile Equipment Identity (IMEI) number. He explained that this data could be used to plot approximate device locations.

¶ 65    Using specialized software, Donahey prepared a series of maps, People's Exhibits 257-275, depicting the movement of the relevant devices on August 2-3, 2021, which were admitted into evidence without objection. Additionally, he authenticated People's Exhibit 23, a Google

20

Earth image showing the route from Fairview Heights to a BP gas station in North St. Louis. According to his analysis, in the early morning hours of August 2, 2021, between 12:12 and 12:26 a.m., data reflected Lovett's phone and iPad traveling from Fairview Heights near the bowling alley toward East St. Louis. At approximately 12:43 to 12:47 a.m., Leonard's and Lovett's devices were together in the area of the McKinley Bridge near BP gas stations at the bridge base, while the defendant's phone remained separate in Granite City near Clayborn's residence at the Port Authority apartments. At 1:08 a.m., the defendant's and Leonard's phones converged near the Sunny Shores Trailer Park in Granite City near Route 3. From 1:26 to 1:29 a.m., the defendant's and Leonard's phones were recorded travelling south on Route 3 near the Walmart. From 1:34 to 1:57 a.m., all three devices converged near the McKinley Bridge and East St. Louis riverfront area heading into Missouri. Later, at 2:18 a.m., the defendant's phone, Lovett's iPad, and Leonard's phone were located near Clayborn's residence at the Port Authority apartments. At 2:53 a.m., those two devices were recorded in Caseyville near the I-64/157 interchange, and by 3:19 a.m., all three devices were present in Fairview Heights near Lovett's apartment complex. The final activity in the record occurred between 5:30 and 5:33 p.m. on August 3, when the devices of the defendant, Lovett, and Leonard registered near each other again in Granite City, east of Route 3.

¶ 66    Donahey then testified regarding call data from the defendant's Verizon phone records. He identified People's Exhibits 252A and 252B as compilations of call records, outbound and incoming, from August 2, 2021, obtained from the defendant's cellphone. Donahey testified that he reorganized the call data received from Verizon chronologically for clarity. The top portion of the exhibits represented the reorganized call sequence, while the lower portion reflected the records as originally received from Verizon. The calls were described as alternating outbound and inbound communications among the defendant's device and two other devices associated with

21

Larry Lovett and Deangelo Enlow. Below is a chart of the call data associated with the defendant's Verizon cellphone account, testified to by Donahey from the night of the shooting, August 2, 2021.

| Phone Communication Summary - August 2, 2021 | | | |
|---|---|---|---|
| Time | Direction | From (Caller) | To (Recipient) |
| 12:07 a.m. | Outbound | Johnson | Lovett |
| 12:10 a.m. | Outbound | Johnson | Enlow |
| 12:12 a.m. | Outbound | Johnson | Enlow |
| 12:13 a.m. | Outbound | Johnson | Lovett |
| 12:16 a.m. | Incoming | Lovett | Johnson |
| 12:17 a.m. | Outbound | Johnson | Enlow |
| 12:19 a.m. | Outbound | Johnson | Enlow |
| 12:21 a.m. | Outbound | Johnson | Enlow |
| 12:23 a.m. | Outbound | Johnson | Lovett |
| 12:47 a.m. | Incoming | Lovett | Johnson |
| 1:07 a.m. | Outbound | Johnson | Enlow |
| 1:58 a.m. | Outbound | Johnson | Enlow |
| 2:44 a.m. | Outbound | Johnson | Enlow |
| 3:04 a.m. | Outbound | Johnson | Enlow |

¶ 67    On cross-examination, Donahey acknowledged that the records produced by the cellphone carriers are maintained by private companies for billing purposes, not for criminal investigations, and that the records identify only a device's location and activity—not an individual's location. He agreed that the location data provided are best estimates, and not precise GPS measurements. He confirmed that call data records for Leonard's device revealed a location in Granite City on August 2, 2021, at 2:18 a.m., after the shooting took place. He further testified that based on the call data from the defendant's cellphone, he did not know whether the calls were connected or simply went to voicemail. Additionally, Donahey testified regarding his interviews with Leonard. He testified that during his September 13, 2021, interview with Leonard, Leonard initially denied involvement but later changed his account after questioning. Donahey acknowledged using interrogation tactics such as raising his voice, suggesting he already knew what happened, terminating the interview, and telling Leonard he would remain in custody until trial. Donahey

22

admitted that he asked Leonard how he got into the backseat prior to Leonard revealing his location in the vehicle, and it was at that point Leonard explained that he switched seats at the Step-N-Go.

¶ 68    On redirect examination, Donahey explained that using interview techniques, such as giving suspects limited information or minimizing their involvement, is a common and intentional strategy to obtain information. He emphasized that the goal of these methods is to obtain truthful statements and verify those statements against other evidence, which he testified was done in this case. On re-cross, Donahey acknowledged that when he interviewed Leonard, he did not yet know which of the three suspects was the shooter and that all three had been charged with first degree murder. Defense counsel questioned whether telling a suspect he was not the shooter went beyond standard interview techniques. Donahey maintained that minimizing the suspect's involvement is common practice and disagreed with the suggestion that it would cause a suspect to simply say what the interviewer wanted to hear. Lastly, on redirect, Donahey confirmed that he had the phone records he had previously testified about when he conducted the interview with Leonard.

¶ 69    The State then rested its case-in-chief. Defense counsel moved for a directed verdict, which was denied. After being admonished by the trial court regarding his decision whether to testify or not, the defendant stated he would not testify. Defense counsel indicated they would not be presenting any evidence and rested. A jury instruction conference was held outside the presence of the jury. The State requested, and the trial court gave, the standard Illinois Pattern Jury Instruction on the theory of accountability without objection. Additionally, each offense charged included the accountability language where necessary in the propositions for the offenses.

¶ 70    The attorneys then presented closing arguments. The State argued that the defendant planned and participated in the murder of Nunley and the attempted murder of Seay. After learning Nunley was in town, the defendant called Lovett at 12:07 a.m., triggering a coordinated attack.

23

Phone data and video evidence showed Lovett and Leonard leaving a Fairview Heights bowling alley after receiving the call, retrieving a Dodge Durango across the river, and meeting the defendant at his parents' Port Authority apartment. The defendant was then observed on surveillance at a Waffle House and nearby gas station around 1 a.m., wearing distinctive clothing later recovered from his home. Cell tower data and video placed the Durango in the Sunny Shores trailer park, circling the area and waiting for Nunley's car. At approximately 1:26 a.m., the Durango followed Nunley and Seay's vehicle onto Route 3. As the vehicles traveled south, the defendant fired multiple rounds from the sunroof—10 striking Nunley and 6 striking Seay. After the shooting, the defendants fled across the McKinley Bridge, switched vehicles again, and were captured on video in St. Louis 30 minutes later, with the defendant purchasing a drink while wearing the same distinctive outfit. Cell tower data again showed all three of the defendants returning to Lovett's apartment in Fairview Heights and staying there all night. The State argued the defendant's actions—alerting Lovett, coordinating movements, personally firing from the Durango, and remaining with Lovett and Leonard through the night—proved his guilt beyond a reasonable doubt for the offenses charged.

¶ 71     The defense argued that the State failed to prove its case beyond a reasonable doubt and left major gaps in the evidence. Counsel emphasized that key witnesses like Nicolis Samuels and Clyde Leonard were unreliable, noting that Samuels was a convicted felon and drug user whose account lacked corroboration, and that Leonard was a self-admitted liar who changed his story multiple times to secure leniency after being charged with first degree murder. The defense further attacked the cell phone and location evidence as speculative, unverified, and incapable of proving who possessed or used the devices or whether any calls actually connected. Counsel maintained that investigators manipulated Leonard's statements, failed to collect or present critical physical

24

evidence such as the gun or Durango, and ignored alternate leads. Ultimately, the defense contended the case was built on an incomplete investigation, unreliable testimony, and unsupported inferences.

¶ 72    In rebuttal, the State argued that overwhelming eyewitness, video, and cell phone evidence proved the defendant's guilt beyond a reasonable doubt, showing he was the shooter who killed Ahmaad Nunley and injured Shamyia Seay. Even if the jury believed Larry Lovett or Clyde Leonard fired the shots, the State contended the defendant was still guilty under accomplice liability, as he planned, facilitated, and participated in the crime by alerting Lovett to Nunley's return and coordinating their movements. The prosecutor defended the reliability of the phone records and witnesses—especially Leonard, whose account was corroborated by cell and video evidence—and rejected the defense's attempts to shift blame or discredit witnesses. The State concluded that the defendant planned, prepared for, and executed the shooting, urging the jury to return guilty verdicts on all charges. The court read the jury instructions, and the jury retired to deliberate.

¶ 73    The jury returned a verdict finding the defendant guilty of one count of first degree murder, one count of attempted first degree murder, and one count of aggravated discharge of a firearm. The jury found that the allegations were not proven that during the commission of the offense of first degree murder and the offense of attempted first degree murder, the defendant personally discharged a firearm.

¶ 74    Following posttrial motions, the defendant was sentenced on November 9, 2022. The defendant filed a motion to reconsider his sentence on November 15, 2022, which was denied on January 12, 2023. The defendant filed a timely notice of appeal on January 13, 2023.

25

¶ 75                                    II. ANALYSIS

¶ 76                          A. Sufficiency of the Evidence

¶ 77    On appeal, the defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of first degree murder and attempted murder either as a principal or under a theory of accountability. To sustain a conviction for the offense of first degree murder, the State must prove that (1) the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of the victim, and that (2) when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to the victim; or he knew that his acts created a strong probability of death or great bodily harm to the victim. 720 ILCS 5/9-1(a) (West 2020). To sustain a conviction for the offense of attempted murder, the State must prove that (1) the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual and (2) the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill an individual. *Id.* §§ 8-4(a), 9-1(a).

¶ 78    When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* Circumstantial

26

evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 79    There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Saxon*, 374 Ill. App. 3d at 416-17. We do not retry the defendant; instead, leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416

¶ 80    In this case, the defendant argues the evidence was insufficient to prove he was the principal shooter because the State's case rested almost entirely on the testimony of accomplice Clyde Leonard, who repeatedly lied to police, received a favorable plea deal in exchange for his cooperation, and whose account was contradicted by the Step-N-Go surveillance video, which defendant claims shows him entering the rear, not the front passenger seat, of the Durango from which shots were fired. Defendant further maintains that no physical or forensic evidence linked him to the shooting, and that the jury's decision to reject the firearm enhancement demonstrates reasonable doubt as to whether he was the gunman. As to accountability, he challenges the State's reliance on cell phone records, arguing that while they may establish contact among the participants, the State failed to prove the content or purpose of the calls, rendering its accountability theory speculative. While acknowledging that "it is undisputed that [the defendant] was present for the shooting," he argues that mere presence in the Durango, continued association with the codefendants, and post-offense conduct—such as leaving the scene, not reporting the crime, staying with the codefendants overnight, and changing clothes—do not establish that he knowingly or intentionally facilitated the crimes.

¶ 81 The State, while acknowledging that the jury found the allegation that the defendant personally discharged a firearm during the offenses had not been proven, responds that the evidence was sufficient to prove the defendant's guilt either as the shooter or under a theory of accountability. It emphasized that the defendant abruptly left Samuels' trailer after learning Nunley was coming and immediately began a series of phone calls to Lovett and Enlow, which coincided with Lovett retrieving the Durango, picking up the defendant, and driving toward the trailer park. Surveillance footage, cell-site data, and call records showed the coordinated movements of the vehicles and participants leading up to the shooting, corroborating Leonard's account. The State further relied on the defendant's post-shooting conduct—remaining with the codefendants, not reporting the crime, discarding clothing, and later being linked to the Durango—as evidence of continued involvement and consciousness of guilt. It maintained that any attack on Leonard's credibility failed because his testimony was strongly supported by the circumstantial and video evidence. Overall, the State asserted that the totality of the evidence fully supported the jury's verdict.

¶ 82 A defendant is accountable for another's crime when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2020). To prove that a defendant possessed the intent to promote or facilitate the crime, the State must prove beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). In determining accountability, the trier of fact may consider the defendant's presence during the commission of the offense, that he fled from the scene, his continued close affiliation with other offenders after the commission of the crime, and

28

his failure to report the crime. *Id.* at 267. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Id.*

¶ 83 Viewing the evidence in the light most favorable to the State, we conclude the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt, either as the principal shooter or, more clearly, under a theory of accountability. The evidence showed that after learning Nunley was coming to Samuels' trailer, the defendant abruptly left and immediately contacted Lovett multiple times, in a sequence that closely tracked Lovett's retrieval of the Durango, his picking up the defendant, and the vehicle's approach to the trailer park. Call data records placed the defendant's and Leonard's (occupants of the Durango) phones together near the Sunny Shore Trailer Park, where the Malibu and the Durango later converged. Video evidence confirmed that the Durango followed the Malibu from the trailer park toward Route 3. Call data records placed the defendant and Leonard's phones along the Route 3 corridor, and video evidence from Route 3 placed the Durango in close temporal proximity to the Malibu before shots were fired between the moving vehicles.

¶ 84 Although the defendant challenges Leonard's credibility and stresses the absence of physical evidence, the jury was entitled to credit Leonard's identification, particularly where it was not isolated but supported by testimony describing the coordinated movements of the participants before and after the shooting, corroborating surveillance footage, and call data records. While the defendant argues that Leonard's account was contradicted by the Step-N-Go video in that it shows the defendant reentering the back seat of the Durango, the defendant admits that the video is "not of the best quality," and this potential inconsistency is only one aspect of Leonard's testimony.

29

The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). The jury here specifically concluded that the evidence was insufficient to prove the firearm enhancement, that the defendant discharged a firearm during the commission of the offense. This finding indicates the jury was careful and deliberate in weighing and considering Leonard's testimony. Though the jury ultimately determined there was not evidence beyond a reasonable doubt that the defendant fired the weapon, the evidence offered by the State was sufficient for a reasonable jury to make such a finding.

¶ 85    Instead, the jury, under the theory of accountability, reasonably inferred that the defendant shared in the criminal intent, either by directing or aiding Lovett as they pursued Nunley or by knowingly participating in a common design to confront and harm him. The defendant's pattern of calls, presence during the pursuit, and actions preceding the shooting, including airing up the tires, supported the conclusion that he knowingly facilitated the attack and intended its commission. Under the common-design theory, the defendant's participation in locating Nunley, traveling with the codefendants in the Durango, and remaining with them after the shooting permitted the jury to find that they were acting pursuant to a mutual plan in which each was responsible for the acts of the other. The jury was permitted to consider the defendant's post-shooting conduct—fleeing from the scene, remaining with the codefendants after the commission of the crime, discarding clothing, continuing to coordinate with the other codefendants, and being linked to the Durango the next day—as evidence of consciousness of guilt and continued adherence to the group's plan.

30

¶ 86    Taken together, the circumstantial, digital, and testimonial evidence did not merely place the defendant near the scene but provided a coherent narrative of coordinated action from planning through execution and flight. A rational trier of fact could therefore conclude that the defendant either fired the shots himself or, at a minimum, intentionally aided or agreed to participate in the shooting through shared criminal intent or common design. The evidence was thus sufficient to support the convictions, and no basis exists to disturb the jury's verdict.

¶ 87                                    B. Ineffective Assistance

¶ 88    Next, the defendant alleges his trial counsel was ineffective for failing to renew a pretrial motion *in limine* that was previously denied by the trial court. Ineffective assistance of trial counsel claims are subject to the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

¶ 89    To satisfy the deficiency prong of *Strickland*, counsel's performance must be so deficient that counsel was "not functioning as the 'counsel' guaranteed by the sixth amendment [(U.S. Const., amend. VI)]." *People v. Easley*, 192 Ill. 2d 307, 317 (2000). A party raising this claim must overcome "the strong presumption the challenged action or inaction of counsel was the product of sound trial strategy." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998).

¶ 90    To satisfy the prejudice prong of *Strickland*, the defendant must demonstrate, but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694; *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Failure to satisfy either prong defeats the claim. *Strickland*, 466 U.S. at 697; *Coleman*,

31

183 Ill. 2d at 397. A claim of ineffective assistance of counsel is reviewed *de novo*. *People v. Lewis*, 2022 IL 126705, ¶ 48.

¶ 91    The defendant argues that counsel was ineffective for failing to renew a previously denied motion *in limine* seeking to admit evidence that the victim, Nunley, overdosed at Samuels' trailer shortly before the shooting. He claims this evidence would have provided an alternative explanation for the series of late-night phone calls between the defendant, Lovett, and Enlow and would have undermined the State's accountability theory. He asserts that, although the trial court initially excluded the overdose evidence as irrelevant, it stated that it would reconsider that ruling if circumstances changed; yet counsel did not seek reconsideration when the State shifted to an alternative accountability theory. The defendant maintains that counsel's failure to re-raise the issue fell below professional norms and prejudiced him because, without the evidence, the jury heard only the State's theory that the calls were made to facilitate the shooting, which he asserts was a closely balanced question. He concludes that there is a reasonable probability the trial outcome would have been different had the overdose evidence been admitted, warranting reversal and a new trial.

¶ 92    The State responds that the defendant was not deprived of effective assistance because defense counsel's decision not to renew the motion was a reasonable strategic choice, consistent with the defense theory that the defendant was never at the trailer and that the cellphone evidence was unreliable. Renewing the motion—and introducing the overdose evidence—would have undermined that theory by implicitly conceding the defendant's involvement in the phone calls which he sought to distance himself from. The State adds that the trial court had already found the evidence irrelevant to any material issue, and nothing at trial provided a realistic basis to expect a different ruling. It further maintains that the overdose evidence would not have altered the outcome

32

because the alleged overdose did not fit the call timeline, which instead matched Lovett's movements toward the trailer park and the defendant's coordination with him. Given this sequence and the strength of the accountability evidence, the State asserts the defendant cannot establish deficient performance or prejudice under *Strickland*.

¶ 93    In addressing the first prong of the *Strickland* test, our review of "counsel's performance is highly deferential," and we "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance." *People v. Pecoraro*, 175 Ill. 2d 294, 319 (1997). Defendant must therefore overcome the strong presumption that the challenged actions were the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). As such, "matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.* Whether or not to file or renew a motion is a matter of trial strategy which will be accorded great deference. *People v. Wilson*, 164 Ill. 2d 436, 454-55 (1994). In matters of trial strategy, the presumption that the strategy was sound may only be overcome where it is so unsound that "counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 63. In other words, the defendant must show that no reasonably effective defense attorney, confronted with similar circumstances, would engage in similar conduct. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 24.

¶ 94    Here, the defendant has failed to show that defense counsel's representation was not a matter of reasonable trial strategy, or so objectively deficient that no reasonably effective defense attorney would engage in similar conduct. Although the defendant emphasizes that the State ultimately requested an accountability instruction, the record shows that counsel extensively argued the weaknesses in the call data records, cross-examined witnesses regarding the timing and reliability of the calls and pursued the overarching defense theory that Leonard falsely identified

33

the defendant as the shooter. Specifically, counsel argued there was insufficient evidence to prove (1) the defendant was associated with the phone number at all, (2) call data records cannot prove who possessed the phone, and (3) call data records are not precise and cannot show whether a call connected or distinguish between an application update or phone call. This approach at trial highlighted weaknesses in the State's evidence regarding the phone calls and implemented a broad, general attack on the reliability of that evidence. Counsel's decision not to renew the motion was objectively reasonable where renewing the motion—which the court had already rejected—risked conflicting with this approach. The defendant would have had to implicitly concede the phone calls connected, and that the defendant placed the calls, to argue that the possible purpose of the phone calls was to inquire about the victim's overdose. In our view, counsel's decision not to renew the motion *in limine* was an acceptable trial strategy under the circumstances of this case. A failure to satisfy either *Strickland* prong "precludes a finding of ineffective assistance of counsel." *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 95    Even assuming deficient performance, the defendant cannot demonstrate a reasonable probability of a different outcome. The overdose evidence was speculative and, at best, only provided a narrow and conjectural alternative for the purpose of some calls. Where counsel directly attacked the State's evidence regarding the call data as insufficient to establish that the calls connected at all, that the defendant placed the calls, or that the device was even associated with the defendant, speculative evidence about the victim's overdose as the purpose of the calls would not likely have altered the outcome. Accordingly, we conclude the defendant's claim of ineffective assistance of counsel fails.

34

¶ 96                            C. One-Act, One-Crime

¶ 97    Lastly, the defendant contends that his conviction of aggravated discharge of a firearm is

based on the same physical act as his first degree murder and attempted murder convictions. Thus,

he argues that his conviction of aggravated discharge of a firearm must be vacated under the one-

act, one-crime doctrine. See *People v. King*, 66 Ill. 2d 551, 559-66 (1977).

¶ 98    The defendant acknowledges that this issue was not properly preserved by failing to raise

it before the trial court, but he seeks review under the second prong of the plain error doctrine.

> "The plain error doctrine allows a reviewing court to consider an unpreserved error
>
> (1) when a clear or obvious error occurred and the evidence is so closely balanced that the
>
> error alone threatened to tip the scales of justice against the defendant, regardless of the
>
> seriousness of the error, or (2) when a clear or obvious error occurred and that error is so
>
> serious that it affected the fairness of the defendant's trial and challenged the integrity of
>
> the judicial process, regardless of the closeness of the evidence." (Internal quotation marks
>
> omitted.) *People v. Coats*, 2018 IL 121926, ¶ 9.

¶ 99    One-act, one-crime violations fall within the second prong of the plain error doctrine as an

obvious error so serious that it challenges the integrity of the judicial process. *Id.* ¶ 10. We note

the State does not argue in its response brief that this issue should not be reviewed as plain error.

Thus, despite the defendant's forfeiture, we will address his argument under the second prong of

the plain error doctrine.

¶ 100   We first consider whether a one-act, one-crime error occurred. A criminal defendant may

not be convicted of multiple offenses when those offenses are all based on precisely the same

physical act. *King*, 66 Ill. 2d at 566. Whether a violation of the rule has occurred is a question of

law, which we review *de novo*. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). In making that

determination, this court follows a two-step analysis. First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An "act" is defined as "any overt or outward manifestation that will support a separate offense." *People v. Crespo*, 203 Ill. 2d 335, 350-41 (2001). If there is only one physical act, multiple convictions are improper. *Rodriguez*, 169 Ill. 3d at 186. If it is determined that the defendant committed multiple acts, the court then moves to the second step and determines whether any of the offenses are lesser-included offenses. *Id.* If none of the offenses are less-included offenses, then multiple convictions are proper. *Id.*

¶ 101   The defendant claims that his aggravated discharge of a firearm conviction must be vacated because it is based on the same physical act as his murder and attempted murder convictions. He argues that the indictment did not differentiate between gunshots or apportion particular shots to separate offenses, instead charging all counts identically as arising from the same volley of gunfire. Additionally, he argues the State treated the shooting as one act at trial—never differentiating between the gunshots that actually struck the victims and any other gunshots that may have been fired. Further, at trial, the State never argued or identified which shots supported aggravated discharge versus those supporting murder or attempted murder, and this failure to apportion the gunshots among the charges, either in the indictment or at trial, precludes the State from treating the defendant's conduct as multiple acts supporting multiple convictions. Accordingly, he argues the aggravated discharge of a firearm conviction violates the one-act, one-crime rule and must be vacated.

¶ 102   In response, the State argues that the conviction is proper because it was supported by a separate physical act—firing multiple shots in the Malibu itself—distinct from the shots that killed Nunley and wounded Seay. It notes that physical evidence showed the vehicle was struck

36

numerous times apart from the victims, and the State expressly differentiated at trial between the shots that hit the victims and the additional shots that riddled the car, flattened the tires, and pierced the vehicle body. Thus, the State maintains that no one-act, one-crime violation occurred.

¶ 103   We find that *Crespo*, 203 Ill. 2d 335 (2001), controls the issue presented to us here. In *Crespo*, our supreme court held that the defendant's conduct of stabbing a victim three times constituted only one single act and did not support multiple convictions. *Id.* at 340-45. The court stated that although the conduct could have supported two separate convictions, one of aggravated battery and another of armed violence, the State did not differentiate between the stab wounds and did not apportion them to separate offenses either in the charging instrument or to the jury at trial. *Id.* Therefore, the State was precluded from treating the defendant's conduct as multiple acts supporting multiple convictions. *Id.*

¶ 104   In this case, the separate gunshots could have supported a separate conviction for aggravated discharge of a firearm toward the occupied vehicle. *Id*. at 342 (finding separate blows, although closely related, constituted separate acts which could properly support multiple convictions). However, it was necessary for the State to differentiate between those shots that struck the victims and those that struck only the vehicle, especially where the victims were each shot multiple times—Nunley 10 times, Seay 6 times—through, and while located within, the vehicle. A careful review of the indictment reveals that the aggravated discharge of a firearm count does not differentiate between the gunshots that struck the victims and those that only struck the vehicle. While the counts associated with the murder of Nunley and the attempted murder of Seay refer specifically to those shots that struck each victim, the victims were inside the vehicle at the time of the shooting. Thus, any gunshot that struck the victims would necessarily have to first pass through the exterior of the vehicle. Accordingly, it was necessary for the State to distinguish

37

between the gunshots in order to obtain a separate conviction of aggravated discharge of a firearm distinct from the murder and attempted murder convictions. We acknowledge that the State presented evidence establishing that certain gunshots only struck the vehicle, including photographic evidence at trial depicting a bullet embedded into the frame of the passenger side of the vehicle; however, a thorough review of the record indicates the State never argued that the bullet embedded in the vehicle, or any other shot that did not strike the victims, constituted a separate act that would support a conviction for aggravated discharge of a firearm. The State, in its brief, emphasizes particular statements and arguments made by the prosecutor at trial in support of its contention that it distinguished between the defendant's conduct. While the State mentioned that the car was "completely riddled with bullets" and the car was "shot so many times it could hardly drive," it never argued that those shots that passed through the vehicle and struck the victims supported the murder and attempted murder convictions, and those shots that only struck the vehicle supported the aggravated discharge of a firearm conviction. "The prosecutor never argued that some of the gunshots would be sufficient to sustain a conviction of aggravated discharge of a firearm and that other, separate shots would be sufficient to sustain a conviction of first degree murder and attempted murder." *People v. Amaya*, 321 Ill. App. 3d 923, 930 (2001) (vacating defendant's conviction of aggravated discharge of a firearm under the one-act, one-crime doctrine because it was based on the same act as his murder and attempted murder convictions). Since the State failed to apportion the gunshots among the charges, it cannot do so now on appeal. *Id.* Accordingly, we hold that the defendant's conviction for aggravated discharge of a firearm violates the one-act, one-crime doctrine. Further, because aggravated discharge of a firearm is a less serious offense than first degree murder and attempted murder, the defendant's conviction of aggravated discharge of a firearm must be vacated. *Id.* at 931.

38

¶ 105                    III. CONCLUSION

¶ 106    For the foregoing reasons, we affirm the defendant's convictions for first degree murder and attempted first degree murder. We deny the defendant's claim of ineffective assistance of counsel. We vacate the defendant's conviction and sentence for aggravated discharge of a firearm.

¶ 107    Affirmed in part and vacated in part.